Savings & Loans v. United States Is there a suggestion that there wouldn't have been another rating after 1988 until 1991? I'm sorry, Your Honor? When? There wasn't another rating after... When would the next rating have been? Assuming that the... let's assume hypothetically, the car file claim is bound by the 87 to 88 rating, when would there have been another rating of this bank to determine what the correct rating was? It was November of 89 was the next one. Okay, so there was one coming up immediately, which wasn't... was that rating actually made or not? Yeah, the rating was rated as a 5 overall, but in the... But because of 5 rating? The capital, yes. The capital would have made it a 5, but the regular testifies that because of the asset quality it was going to be a 4 in pursuit of Article 385. But the 5 rating wasn't in effect at that point. That's correct, but I think that they discounted, they recognized the capital. This was in November of 1989, so by the time the exams finish, they have gone into the post-part of your period. Your Honor, my time is... I need to... You may... But, Your Honor, I have to bring up two other issues, so I just have to quickly bring these up. One is the failure to account for increased costs. There were salary costs and advertising costs that the court ignored in its award. It recognized that those costs existed, it just did not calculate those in the non-rich world. And secondly, the court award failed to account for the loss of non-contractual capital. The court did not address that. It was $27 million of non-contractual capital that was lost with FIREA. Plaintiffs argued that we didn't make this argument. Well, we did. It's page 31 to 33 of our reply brief. Thank you, Your Honor. Thank you. We'll restore Mr. Roberson's entire rebuttal time to 5 minutes. And he'll give Mr. Eisenhardt an additional 4 minutes, so we'll have an equal time. If he needs to... Thank you, Your Honor. Mr. Eisenhardt, you may proceed. Frank Eisenhardt, representing the Historic Federal Savings and Loan. Judge Bryson, I'd like to start by addressing the question you posed to Mr. Roberson concerning the applicability of RV3A1 post-FIREA. RV3A1 was never actually applied to Fidelity post-FIREA. When FIREA hit Fidelity, the operable regulations required Fidelity, if it was going to stay open at all because of the severity under capitalized, to submit a capital plan, which Fidelity did. And that's what Fidelity operated under post-FIREA. But the question is, would it have... One question is, would it have been subject to effectively the same constraints as the capital plan under RV3A1, which I gather would have applied if they had been solid, but a four? The government's argument is that if you create a hypothetical world in which FIREA has occurred, but Fidelity, for some reason, has not lost its capital, I think they say Fidelity was grandfathered, they say then RV3A1 would have applied Do you dispute that if FIREA hadn't been passed, that RV3A1 would have applied to this ban? Well, recognize, just like RV3A1 was a post-FIREA regulation, so I'm not even sure if FIREA hadn't passed that there would have been an RV3A1. But that doesn't matter, because there was no contractual obligation to the government not to promulgate RV3A1. That's true. And I think the way to look at how RV3A1 might have applied in this hypothetical world, there are really two overarching considerations. What I'm trying to understand is whether you're contesting the government's basic point. They're saying RV3A1 in the capital plan had the same consequences if there was a four rating under the RV3A1. Do you dispute that? With respect to growth restrictions, they're right. Because both of them would have allowed growth only to the extent of interest approved. So do you then agree that the Court of Federal Claims had to determine that there would not have been the same restrictions as a result of the asset problem in order for you to purvey it? The government, and this is an affirmative defense, and the Court of Appeals, the Court of Federal Claims, excuse me, would have had to conclude that the government had presented sufficient evidence that RV3A1 would have applied, that there would have been a four rating, and that growth would therefore have been restricted. But if they established that they would have had a four rating, the government wins, right? If they established that they would have had a four rating because of problem real estate loans, then they have a good argument that RV3A1 would have applied. And that you shouldn't recover damages, right? That would have impacted the lost profits model, yes. So you're not disputing that the affirmative defense exists in theory. That's correct, right? So the question is whether they established it as a matter of fact. Whether they established it as a matter of fact, correct. And the question there is would the four rating have continued after 87 to 88, correct? Actually, you have to take one step back from that. I think there is a substantial evidentiary question whether the four rating in 1988 resulted from the problem real estate loans. I don't think that that's at all clear. Judge Wheeler, in his opinion, Well, how can the Court of Federal Claims second-guess the regulatory determination that was made in 87 to 88? They can't second-guess the regulatory determination. They cannot. And I don't think Judge Wheeler ever purported to do that. They cannot second-guess it. They cannot. But there is nothing in the documentary record of that four rating in 1988 that says this is due to problem real estate loans. The documentary record simply says the institution has problem real estate loans. We're rating them a four for assets and a four overall. It doesn't say what drove the rating. And, in fact, the evidence of what drove that rating in 1988 is all over the map. Recognize that the... But in legal education, they testified the four rating would have continued, right? They said the four rating would have continued because of problem real estate loans. However... That's the contrary testimony. Their own testimony contradicts it. First of all, the rating prior to 1988, which was in 1985, the assets were rated exactly the same. They were rated a four. However, the overall rating was a three. If, as the government contends, the asset rating drives the overall rating, why would they have been a three in 1985? The only rating that changed between 1985 and 1988 was management. They were rated a two for management in 1985. That brought to a three in 1988. One of the government's own witnesses, Mr. Albanese, testified that, in his view, of the five factors, management was the most important. And that's the one that changed. That sounds like all your arguments. They testified that there was a four rating. Was there contrary testimony that wouldn't have been a four rating? The main witness who testified that four rating was given... First of all, understand that the examiner in charge of the 87 exam, which resulted in the 88 rating, was never called. So we have no testimony from the one person who would have known as to what drove that rating. Mr. Amond, who was not involved in the exam, he was a field supervisor, said, I think looking at the exam report, it must have been driven by the real estate loans. But then he said, well, you'd also have to take the management rating into account, too. So he's ambivalent as to whether it's real estate or real estate and management. Mr. Albanese, his supervisor, says management's most important, and management's the one that actually went down. Mr. Thigna, who was the regional manager, who was at the top of the heap, says in his view capital is the most important. Capital is the one that's going to drive the rating. So their own evidence on this point of what caused the rating in 1988 is inconsistent. Likewise, you have to determine what would have happened in this parallel world post-Firea. And there are really two overarching considerations there. The first is, recognize that this regulation was completely discretionary. The government treats this as though this is a mandatory thing. If you have a four or five rating, you're not going to be permitted to go, to grow, end of the day. That's not the way it worked. This is totally discretionary with the regulation. There are waivers that need to be provided. The director of the OTS region, which in this case is Anil Thigna, who was director of the Northeast region, has the power to grant a waiver. Was there any testimony that there would have been a waiver? Interestingly, the government, whose defense this was, never asked him that question, but they asked him a question very close to it that gives some real insight into it. So the answer is there was no testimony. There was no clear question, would you have granted a waiver? One way or the other. One way or the other. The question that was asked, though, is I think very important. There is a thing called risk control arbitrage, which is a technique that is more complex and more risky than what Fidelity was actually doing. Fidelity was buying mortgage-backed securities and earning a very good profit on them, and that's really the way they moved themselves back into capital compliance. Risk control arbitrage takes it a step further. In that, you're hedging your positions using mainly interest rate swaps. It was a recognized technique. That would have been effected by RB3A12. They would not have been able to do a risk control arbitrage. The government lawyers asked Mr. Thigna, would you have allowed them to do risk control arbitrage? The answer to that was yes, he would have had a granted exception. He says, yeah, I'd sure have to consider it so long as it didn't add any undue risk to the balance sheet. Well, if he would have had to consider risk control arbitrage as long as it did not add undue risk, he certainly would have had to contribute what they were actually doing. And the question then becomes why? He didn't make any finding about waivers, did he? No, he did not make any finding about waivers. So it seems to be quite speculative for us to say, well, there's your answer. It's waivers. Well, I don't know that it's any more speculative to say they wouldn't have done it, they would have waived it, than it is to say they would have done it. The question really becomes what motive would they possibly have had to restrict the penalty using RV3A1? The growth that they were positing, the growth on which the lost damages model is based, is not going back into commercial real estate again. It's not going off into some new field. It is a modest incremental expansion of a program that they're already doing in the real world that's complete success, that's earning them money, that's run by a guy who the regulators describe as the best CFO we ever came across, who Mr. Bingo, who had the power to grant the waiver, regarded as a genius at squeezing back the needed earnings out of the balance sheet without taking undue risk. The court sets an 8.2% growth rate a year. Yes, sir. What justifies that percentage? I think it's discussed mostly on page 26 of the court's opinion, and it does list some high growth rates in some years where there was a very high inflation. Do those growth rates take the inflation out of the equation? I believe they do. I can tell you the genesis for the 8% annual growth, which if you compound it comes out to something like 8.2, is that that's the figure that Dr. Kaplan used in his lost profits calculation. And there's pages and pages of testimony in Dr. Kaplan's testimony about why he used that. He said, I was looking for the most conservative growth rate I could find, obviously realistic, but very conservative. I looked at the actual growth rates, and they were generally well above that figure. But they issued a business plan in 1988, which was the last business plan before FIREA, in which they said, it is our plan to grow the institution at an annual rate of 8 to 10%. And he said, for my lost profits model, I took the bottom end of that range. There's also testimony... Why didn't the court award the offsets? Salary reductions, marketing... There's absolutely no evidence of the salary reductions, the salary reduction of marketing. Well, you had to reduce the staff by 25%, so there's evidence. That's going to save you some money. It all goes down. They presented no testimony, factual or expert, on this issue. The only evidence they pointed to after the fact, in the post-trial briefing and on appeal, is a budget that Fidelity prepared in which they budgeted certain marketing and advertising expenses. And the testimony was that because of the restrictions the capital plan put on them, a lot of this never got done. But the government's own testimony is that these budget figures are simply predictions of what might happen, and they bear no relation to reality. They never tried to tie the personnel deductions into marketing and advertising. This is simply something they seized on after the fact. There's not really any evidence of it. The other restrictions... They say that there would have been a period of no growth in the period of time just before Fidelity converted into stock form, and, of course, in that conversion, achieved capital compliance. The evidence, again, doesn't support that. What Mr. West, who's the chief financial officer, said is, looking at that period of time, we didn't plan to grow very much in that period of time because we wanted to be careful to stay within the agreed parameters for the capital conversion. We certainly wanted to make sure we didn't grow in a way that would put us out of capital compliance or at least put us over our budget. And bear in mind that Dr. Kaplan testified that when he chose 2% quarter as his model in the Law of Profits claim, he wasn't predicting that they would grow like clockwork 2% every quarter. He's saying that's a reasonable, conservative number to use. There would have been some quarters where they grew by much more than 2%. There surely would have been some quarters where they grew less than 2%. But I think, overall, 2% per quarter is a very conservative figure to use, and that's the reason why he used it. So the government has gotten the benefit of his conservatism using the 8% figure. They shouldn't be allowed to go back and say, aha, you wouldn't have hit your 2% growth in this particular quarter. We've got to reduce it for that. If we can return for a moment to the macro issue, give me a quick summary of the evidence as to the 89 to 90 macro rating that that was affected by the enactment of IREA. Well, I don't think there was ever any dispute that the actual macro ratings post-IREA were driven by Kaplan. But I guess my first question is that 1189 through 790, I guess, was the period of that macro analysis and ultimate rating. Did that incorporate post-FIREA numbers? Yes. OK, so the only immediate pre-FIREA macro rating was the 8738. Correct. And that was the 4. That was the 4. All right, and then it went down to 5, and you say that was driven by the fact that that was capital and that incorporated the post-FIREA numbers. Not just a projection or an anticipation of FIREA, but actual FIREA numbers, correct? That's correct. The first post-FIREA macro rating, I think everybody agrees, was driven by capital. They were capital deficient. What is the evidence that the 87 to 88 rating was in any way affected by FIREA? The only evidence of it is the timing. Recognize these exam reports, particularly in the pre-FIREA days, frequently came in a year or more after the actual exam began. So that rating was delivered to them, I believe it was around September of 1988, even though the exam began in 87. So there was no testimony that the rating was affected by FIREA? No, there was no rating. There was no direct evidence of that. So that 4 was in place until it was substituted with a 5 in July of 1990, is that correct? That would be correct. So the 3A1 would have been in effect until July of 1990, no matter what? Unless what? If they chose to apply it, it's a better way to look at it. Let's assume that since nobody said a word about waiver, that we won't look at waiver. That would have simply locked the institution in to the no growth provision or the restricted growth provision of RB3A1 until July. At that point, the capital difference in the non-breach world might have produced a different number. If there had been an RB3A1, and if they had chosen to apply it based on that 4 rating, yes. What you say would have happened would have happened. The last thing I'll take in my last 30 seconds or so is this whole issue of the lost profits award should have been reduced because of the so-called non-contractual capital. The issue here, of course, is that they had another acquisition where they had supervisory goodwill from it, but there was no contract with the government. That goodwill arose simply by normal accounting standards. And the easy answer here is that you don't reduce the lost profits calculation to account for that non-contractual capital because it was never a part of it in the first place. When Dr. Kaplan modeled the lost profits claim, he modeled it based only on the contractual capital that was lost. So that non-contractual capital never figured into his claim to begin with, and there's no reason why it should be taken out. Thank you, Mr. Eisenhardt. Mr. Roberson, you have five minutes of your rebuttal. I guess what I'm going to do is turn back from the order of his argument from the points I'm going to respond to. First, the plaintiff said that RBA 3A1 was not provided to the institution. It was provided to the institution. It's at 200-471-74. It was provided in January of 1990. It indicated that it was going to be applied to the institution. The second thing is the notion that the plaintiff argued that there was some confusion about whether the 4 rating in 1987 was based on bad loans. The court expressly found, and it really can't be argued, that the 4 rating was based on its bad loans. It's at page 12 of the appendix. The court found that the bad commercial loans caused the 4 rating in 1987. Is there any reason that that's pertinent other than to extrapolate into the reason that the later ratings may have also been lower than the plaintiff's claim? Well, that's the point. But that's the only point. The rating was what it was. The court said, therefore, both sides are stuck with what the rating was in 1987. It wasn't affected by 5A at all. That's correct. And there's no doubt. There's 100 pages in that report of examination dealing with the bad loans. They only got worse in time, as I've already pointed out. With respect to the notion that in 1985, they received a 4 in asset quality rather than a 3 overall rating. In 1985, their asset quality was nowhere near as bad. We're talking about magnitudes of multiplication, how quickly their loans degenerated. In fact, they doubled between 86 and 87 to show how fast they went back. And then they continue on to 89. So the notion that there's a comparable with 85 is simply not true. Plaintiffs argue that we didn't call the 87 examiner. We called his supervisor, Mr. Amen, who was widely looked on as the person with the most experience overlooking the threat. He had done their 85 examination. He became the field manager who was a supervisor of the examiners in charge. He became an assistant director. He had hands-on contact with that institution from the 85 period straight through to 95. And to give you the citations with respect to his qualifications and how people looked at it, Mr. Powerly testified at 104.07 that he knew the bank very, very well, he and Mr. Vigna. Mr. Powerly had a high opinion of Amen and testified that Mr. Amen had the most hands-on experience, page 100, 661 to 62. And the court recognized that the plaintiffs' witnesses considered Mr. Amen to be one of the most competent regulators that they'd ever worked with. And that's page 17 of the joint appendix. Now, let me tell you, I'm bothered by one thing, which neither one of you has addressed. And that is this testimony by Kaplan at 103.177. Why isn't this contrary testimony that the floor rating would not have continued? Are you familiar with that page? No, I'm not. You have it here. I think I understand what his testimony was on. Do you have the appendix here? Yes, I do. But I think I know that slide now that I'm thinking about it. And I think what he's saying is that, well, regulatory capital wouldn't give you flexibility. And that's the argument that the court actually uses otherwise. And that's an argument that, well, goodwill provides you with some flexibility. And therefore, you could have somehow gotten away from your bad loans. And what Mr. Kaplan actually did was he relied on Mr. Powderly's testimony. If you look at that testimony carefully, Mr. Powderly acknowledged that goodwill can't be used for loan loss preserves. It can't be used to fix up real estate that you require. It can't be used to purchase other businesses. And there's a whole slew of things that goodwill cannot do with the real world to affect the market value of a loan, to affect the market value of a property, anything to do with the real world with respect to fixing up real estate. So there's sort of an ambiguity with respect to the notion of goodwill. Is goodwill the same thing as goodwill capital? No, it's not. Goodwill capital can't do some of these things that capital can do. So the testimony of Mr. Powderly is off to begin with. Now, secondly, there is the notion that goodwill could have offered you more flexibility in the non-reach world with dealing with your real estate owned. And if you have more capital and you have real estate owned, it may be that you can decide whether to hold a non-performing asset for a long period of time and then later decide to sell it. But that kind of flexibility is only after the fact of the loss. You have already taken your loss and you're real estate owned. You've already written down the loan. So it doesn't Final thoughts, of course, Mr. Roach. Your Honor, the bottom line is that this institution was troubled before Firewood because of its bad loans. The regulators couldn't avoid $30 million in losses before 1987. And it had the same problems. It would have had the same problems in the non-reach world. Thank you, Your Honor. For the following reasons, we would like to. I think we know what you want. Thank you. Appreciate it. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock.